**No. 23-1547**

_____

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

**UNITED STATES OF AMERICA,**

Plaintiff-Appellee,

v.

**MARIO ONESIMO GONZALEZ,**

Defendant-Appellant.

_____

Appeal from the
United States District Court
for the Southern District of California
Honorable Jinsook Ohta Presiding
3:21-cr-03308-JO-1

_____

**APPELLANT'S OPENING BRIEF**
_____

Daniel J. Yadron, Jr.
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
danny_yadron@fd.org
Attorney for Mr. Gonzalez

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................ VII

INTRODUCTION.................................................................. 1

STATEMENT OF JURISDICTION ................................................ 4

BAIL STATUS ................................................................... 4

ISSUES FOR REVIEW............................................................ 4

RELEVANT PROVISIONS ........................................................ 5

STATEMENT OF THE CASE....................................................... 5

    A.   The government conducted an ex parte viewing of Mr. Gonzalez's van and cut wires connecting a GPS tracker to other parts of the vehicle. ..................... 8

    B.   The government called a new expert in drug values that allowed the government to argue that the drugs' value was double what it argued in the first trial. ........................................................ 9

    C.   Prosecutors elicited additional testimony that Mr. Gonzalez's car smelled like gasoline from an officer that did not mention the smell in the first trial. ................................................................ 12

    D.   During closing arguments, the prosecutor accused Mr. Gonzalez of lying, called his defense "ridiculous," claimed that drug traffickers would not trust $250,000 worth of drugs to an unknowing courier, and misstated the testimony of the automobile expert. ................................. 15

SUMMARY OF THE ARGUMENT .................................................. 17

ARGUMENT ..................................................................... 21

I.    The government violated Mr. Gonzalez's right to due process when it destroyed obviously exculpatory evidence. ...................................................... 21

    A.    Standard of Review ...................................... 21

    B.    The government cannot destroy or limit access to evidence that is known to be exculpatory and cannot be replicated. ................................... 22

    C.    The government acted in bad faith. ............. 23

    D.    The GPS device and microphone—and how they were wired into the vehicle—were of such a nature that Mr. Gonzalez was unable to obtain comparable evidence. ................................... 27

II.   A government agent's testimony about drug prices violated the Federal Rules of Evidence and the Confrontation Clause. ....................................... 29

    A.    Standard of review ....................................... 29

    B.    The drug price expert had no reliable basis for her opinions and simply parroted the out-of-court statements of others. ................................... 30

    C.    The drug price expert relied on the out-of-court testimony of people whom Mr. Gonzalez could not cross-examine. .......................................... 34

III.  The district court erroneously barred Mr. Gonzalez from impeaching by omission. ............................. 40

    A.    Standard of Review ...................................... 40

    B.    Criminal defendants have wide latitude to impeach by omission. ................................... 41

v.

C.    The district court erroneously insisted that
      Mr. Gonzalez show that the witness was asked an
      identical question in the first trial. ............................. 42

IV.   The prosecutor committed misconduct during closing
      argument. ................................................................... 45

      A.    Standard of review ........................................ 45

      B.    The prosecutor impermissibly expressed personal
            opinions about Mr. Gonzalez's veracity and guilt. ...... 47

      C.    The prosecutor shifted the burden of proof onto
            Mr. Gonzalez by demanding that he prove
            smugglers would trust valuable drugs with an
            unknowing courier. ........................................ 51

      D.    The prosecutor misrepresented the testimony of
            the automobile expert. .................................. 54

V.    Reversal is warranted under a cumulative error
      analysis. ...................................................................... 56

CONCLUSION ................................................................... 58

CERTIFICATE OF RELATED CASES .............................. 60

CERTIFICATE OF COMPLIANCE ..................................... 61

TABLE OF AUTHORITIES

## Cases

*Berger v. United States*, 295 U.S. 78 (1935) ...................................... 47, 55

*Brady v. Maryland*, 373 U.S. 83 (1963) .................................................. 22

*California v. Trombetta*, 467 U.S. 479 (1984) ................................... 22, 23

*Chinn v. Shoop*, 143 S. Ct. 28 (2022) ..................................................... 38

*Crawford v. Washington*, 541 U.S. 36 (2004) ................................... 35, 40

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) ................................................................... 30

*Davis v. Washington*, 547 U.S. 813 (2006) ............................................. 35

*Hodge v. Hurley*, 426 F.3d 368 (6th Cir. 2005)...................................... 48

*In re Winship*, 397 U.S. 358 (1970) ....................................................... 51

*Jenkins v. Anderson*, 447 U.S. 231 (1980) ....................................... 41, 43

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................. 31

*Lucero v. Holland*, 902 F.3d 979 (9th Cir. 2018)......................... 35, 37, 38

*Marvel Characters, Inc. v. Kirby*, 726 F.3d 119 (2d Cir. 2013)............... 31

*Molina-Martinez v. United States*, 578 U.S. 189 (2016) ........................ 38

*Ollier v. Sweetwater Union High Sch. Dist.*,
   768 F.3d 843 (9th Cir. 2014) ...................................................... 30

*Rosales-Mireles v. United States*, 138 S. Ct. 1897 (2018) ....................... 39

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................ 38

*Taylor v. Kentucky*, 436 U.S. 478 (1978) ............................................... 56

*Udemba v. Nicoli*, 237 F.3d 8 (1st Cir. 2001) ........................................ 43

*United States v. Alcantara-Castillo,*
    788 F.3d 1186 (9th Cir. 2015) ....................................................... 47, 48

*United States v. Ayotte*, 741 F.2d 865 (6th Cir. 1984) ...................... 41, 45

*United States v. Bagley*, 473 U.S. 667 (1985) ......................................... 39

*United States v. Cooper*, 983 F.2d 928 (9th Cir. 1993) ............... 22, 23, 27

*United States v. Denetclaw*, 96 F.3d 454 (10th Cir. 1996) ..................... 43

*United States v. Dominguez Benitez*, 542 U.S. 74 (2004) ....................... 38

*United States v. Dukagjini*, 326 F.3d 45 (2d Cir. 2003) .......................... 36

*United States v. Flores*, 510 F. App'x 594 (9th Cir. 2013) ............... 20, 53

*United States v. Frederick*, 78 F.3d 1370 (9th Cir. 1996) ............... 21, 56

*United States v. Gajo*, 290 F.3d 922 (7th Cir. 2002) ............................. 43

*United States v. Garcia*, 793 F.3d 1194 (10th Cir. 2015) ....................... 31

*United States v. Gasca-Ruiz,*
    852 F.3d 1167 (9th Cir. 2017) (en banc) ............................................. 40

*United States v. Gomez*, 725 F.3d 1121 (9th Cir. 2013) ................... 37, 38

*United States v. Grunberger*, 431 F.2d 1062 (2d Cir. 1970) .................. 50

*United States v. Hinkson,*
    585 F.3d 1247 (9th Cir. 2009) (en banc) ........................................ 40, 46

*United States v. Johnson*, 587 F.3d 625 (4th Cir. 2009) ........................ 36

*United States v. Kantengwa*, 781 F.3d 545 (1st Cir. 2015) ..................... 31

*United States v. Kerr*, 981 F.2d 1050 (9th Cir. 1992) ................. 47, 48, 50

*United States v. Kojayan*, 8 F.3d 1315 (9th Cir. 1993) ........................... 47

*United States v. Larson*, 495 F.3d 1094 (9th Cir. 2007) (en banc) ......... 40

viii.

*United States v. Macias*, 789 F.3d 1011 (9th Cir. 2015) .................. 30, 39

*United States v. Maloney*, 755 F.3d 1044 (9th Cir.2014) (en banc) ........ 47

*United States v. McKoy*, 771 F.2d 1207 (9th Cir. 1985) ........................ 48

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) ........................ 32, 35

*United States v. Michell*, 65 F.4th 411 (9th Cir. 2023) ........................ 38

*United States v. Ochoa-Sanchez*, 676 F.2d 1283 (9th Cir. 1982) ........... 42

*United States v. Prantil*, 764 F.2d 548 (9th Cir. 1985) .......................... 54

*United States v. Reyes*, 577 F.3d 1069 (9th Cir. 2009) ........................... 48

*United States v. Ruiz*, 710 F.3d 1077 (9th Cir. 2013) ...................... 50, 51

*United States v. Ruvalcaba-Garcia,*
  923 F.3d 1183 (9th Cir. 2019) ........................................ 29, 30

*United States v. Sanchez*, 176 F.3d 1214 (9th Cir. 1999) ...................... 49

*United States v. Sanchez-Soto*, 617 F. App'x 695 (9th Cir. 2015) ........... 55

*United States v. Sanders*, 421 F.3d 1044 (9th Cir. 2005) ...................... 39

*United States v. Schuler*, 813 F.2d 978 (9th Cir. 1987) ......................... 56

*United States v. Shih*, 73 F.4th 1077 (9th Cir. 2023) ...................... 18, 31

*United States v. Sivilla*, 714 F.3d 1168 (9th Cir. 2013) ............. 18, 21, 23

*United States v. Stewart*, 907 F.3d 677 (2d Cir. 2018) ........................... 43

*United States v. Stock*, 948 F.2d 1299 (D.C. Cir. 1991) ........................ 41

*United States v. Tipton*, 269 F. App'x 551 (6th Cir. 2008) ..................... 32

*United States v. Tydingco*, 909 F.3d 297 (9th Cir. 2018) ....................... 38

*United States v. Vaandering*, 50 F.3d 696 (9th Cir. 1995) .............. 52, 53

ix.

*United States v. Valencia-Lopez*, 971 F.3d 891 (9th Cir. 2020)..............31

*United States v. Valenzuela–Bernal*, 458 U.S. 858 (1982)......................22

*United States v. Velazquez*, 1 F.4th 1132 (9th Cir. 2021) ......................45

*United States v. Vera*, 770 F.3d 1232 (9th Cir. 2014) ................31, 35, 36

*United States v. Wells*, 879 F.3d 900 (9th Cir. 2018) .............................21

*United States v. Zaragoza-Moreira,*
    780 F.3d 971 (9th Cir. 2015) ........................................................23, 24

*Williams v. Illinois*, 567 U.S. 50 (2012) ..................................................32

## Other Authorities

Amy Howe, *Court Appears to Favor Arizona Man's Confrontation
    Clause Claim*, SCOTUSblog (Jan. 10, 2024, 5:48 PM) ........................36

Brief of Amicus Curiae Nat'l Assoc. of Fed. Defenders, *Diaz v. United
    States*, No. 23-14 (January 3, 2024) ..........................................7, 25, 53

Tr. of Oral Argument, *Smith v. Arizona*, No. 22-899 (Jan. 10, 2024) ....36

## Rules

Fed. R. Crim. P. 52 ...................................................................................38

Fed. R. Evid. 702.......................................................................................32

## Treatises

1 *McCormick on Evidence* § 34
    (Robert P. Mosteller ed., 8th ed. 2022)....................................19, 41, 42

## Constitutional Provisions

U.S. Const. amend. VI .........................................................................19, 35

x.

INTRODUCTION

Mario Gonzalez's ordeal had nearly ended. After his first trial where he faced accusations that he knowingly imported drugs, the jury voted 11–1 to acquit him. Yet despite persuading just one holdout juror on the strength of its case, the government continued with the prosecution. This case asks whether the government, in retrying Mr. Gonzalez, employed unfair and unlawful means to secure that elusive conviction. It did.

First, the government violated Mr. Gonzalez's right to due process when it altered and damaged evidence it knew to be exculpatory. That occurred when the government cut out from Mr. Gonzalez's van a GPS tracker that appeared to be connected to a microphone and a switch that could let an outsider control some part of the vehicle. Such evidence would have undermined claims that Mr. Gonzalez *knew* he was transporting drugs because, as the government has acknowledged in other cases, drug traffickers often place GPS devices and drugs in the vehicles of unsuspecting drivers with regular crossing patterns—like Mr. Gonzalez. Yet because of the government's destruction of evidence, Mr. Gonzalez could not establish the device's full functionality.

1

Second, between trials, the government changed the theme of the case from drugs to money. To do so, it put on a new drug-price expert that allowed the prosecution to *double* the value of the narcotics compared to that given at the first trial by a different, more experienced, expert. That new testimony violated the Federal Rules of Evidence and the Confrontation Clause. The new expert could not meet Rule 702's reliability threshold because she could not explain how a law enforcement price list derived the wholesale value of methamphetamine and fentanyl. The agent merely parroted the opinions of other unnamed officers and suspects in the guise of her expert opinion. And by serving as a conduit for the testimonial hearsay of other out-of-court witnesses, the agent also violated the Confrontation Clause.

Third, the government added another new theme to the second prosecution: Mr. Gonzalez's minivan smelled like gas. Officers found drugs in the vehicle's altered gas tank. The theory went that because multiple officers testified—in the second trial—that Mr. Gonzalez's car smelled of gasoline, Mr. Gonzalez must have smelled gas, too. He thus must have known that his gas tank was shoddily altered to hold contraband. The problem for the government was that only one officer—

2

who never entered the vehicle—testified in the first trial that the van smelled. So, in the second trial, the government pointedly elicited testimony from *another* officer—who did enter the vehicle—that the van smelled of gas. Yet that officer made no mention of smells in the first trial, despite testifying at length about all of the things he found odd during his detailed inspection. Contrary to the weight of authority, the district court barred Mr. Gonzalez from asking about that shift in testimony during cross examination.

Finally, the prosecutor committed repeated misconduct in his closing argument. He expressed personal views about Mr. Gonzalez's veracity and the "ridiculous[ness]" of his defense. 5-ER-776. He meanwhile shifted the burden of proof by challenging Mr. Gonzalez to prove that drug traffickers would trust nearly $250,000 of drugs with an unknowing courier. Finally, the prosecutor argued a fact not in evidence. He claimed that the government's vehicle expert provided testimony allowing the jury to find that the car smelled like gas. That expert said no such thing. In fact, each time the government asked the expert about smells, it drew a sustained objection.

To the extent any of those errors sound subtle, their cumulative

3

effect was not: Mr. Gonzalez went from a jury that voted 11–1 for acquittal to a jury that voted 12–0 to convict. If that does not amount to prejudice, it is hard to fathom what would.

## STATEMENT OF JURISDICTION

The district court had original jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction over a timely appeal from a final order entered in the Southern District of California. *See* 28 U.S.C. §§ 41, 84(d), 1291, 1294(1). The district court entered judgment on July 14, 2023. 1-ER-2.[1] Mr. Gonzalez timely filed a notice of appeal four days later on July 18, 2023. 2-ER-96; Fed. R. App. P. 4(b)(1).

## BAIL STATUS

Mr. Gonzalez is imprisoned at USP Lompoc. His release date is September 25, 2025.

## ISSUES FOR REVIEW

1. Whether the government violated Mr. Gonzalez's right to due process by damaging exculpatory evidence and preventing further investigation.

2. Whether the government violated Federal Rule of Evidence 702 and the Confrontation Clause through a purported expert on

---

[1] "ER" refers to the Excerpts of Record. "PSR" refers to the Presentence Report.

4

illegal drug prices who simply parroted the price estimates of
unknown out-of-court witnesses.

3. Whether the district court erroneously barred Mr. Gonzalez
   from impeaching by omission a government witness.

4. Whether the prosecutor committed misconduct in closing
   argument by (a) suggesting, in his personal opinion, that
   Mr. Gonzalez was guilty because he presented a "ridiculous"
   defense, (b) shifting the burden of proof, and (c) claiming a key
   fact not in evidence.

5. Whether the cumulative effect of those errors prejudiced
   Mr. Gonzalez.

## RELEVANT PROVISIONS

The addendum contains a copy of the Fifth and Sixth

Amendments to the U.S. Constitution as well as Federal Rule of

Evidence 702. *See* Ninth Circuit Rule 28-2.7.

## STATEMENT OF THE CASE

Most Saturdays before dawn, Mr. Gonzalez, a United States

citizen, would wake up and drive a jalopy of a minivan from his home in

Tijuana, Mexico, to San Diego, California. 3-ER-397; 4-ER-714. He used

to work with his brother-in-law at a farmers market in town. 4-ER-655.

When his relative gave up the business, Mr. Gonzalez switched to

picking up goods at flea markets and other places that he could resell

for a higher price back home. 5-ER-783. Leaving early prevented him

from having to sit in line with his foot on the brake while battling excruciating pain from medical conditions. 3-ER-269.

The week of November 13, 2021, the minivan's instrument panel was on the fritz. 4-ER-435. He called up a friend who said that his car appeared to have an electrical problem. 4-ER-677. He knew a guy. *Id.* Mr. Gonzalez dropped off the car, and the mechanic worked on it for three days. *See* 4-ER-680. By Friday, Mr. Gonzalez had his van back and prepared to leave at 3 a.m. for the boarder the next day. 4-ER-680.

He never made it across. An officer at the port of entry thought that the car smelled like gasoline. 3-ER-282. He referred Mr. Gonzalez to secondary inspection. 3-ER-283. Agents there, following a thorough inspection—found methamphetamine and some fentanyl hidden in makeshift compartments welded underneath the seats. The twenty-six-gallon gas tank also had been partitioned such that six gallons could hold gas and the other twenty could hold narcotics. *See* 4-ER-572. Another officer also found what he thought was a GPS tracker and an apparent microphone hotwired into the instrument panel. 3-ER-320, 353. He cut both out. 3-ER-353. The officer did not document how exactly they were wired into the vehicle.

6

When questioned, Mr. Gonzalez waived his rights and talked about the neighbor and a mechanic to agents. He said that his plan that day was to drive to the farmers market and ask Salvador Martinez, another vendor he knew from working at the market, if he could work for him. 5-ER-778. The government charged Mr. Gonzalez with importing methamphetamine and fentanyl.

Mr. Gonzalez pleaded not guilty and proceeded to trial. But, on the eve of his testimony, the government's automobile expert made a major discovery: The apparent GPS device in Mr. Gonzalez's van was not a tracker, but a car alarm. *See* 6-ER-1188–89. This would have been an unwelcome development for Mr. Gonzalez—or any person accused of importing drugs—because GPS trackers are associated with schemes that rely on "blind mules" to smuggle drugs in unknowingly and innocently. *See, e.g.*, Brief of Amicus Curiae Nat'l Assoc. of Fed. Defenders at 5–8, *Diaz v. United States*, No. 23-14 (January 3, 2024) (documenting drug traffickers' placement of drugs and a GPS tracker in the vehicles of unknowing couriers) [hereinafter Amicus Br.]. The expert remained less-than certain about the wire believed to be a microphone. *See* 6-ER-1189, 4-ER-598.

7

That latent discovery scrambled the parties' presentations at trial. Mr. Gonzalez was forced to explain why a person who did not know he had anything valuable in his old minivan would install an aftermarket car alarm. The government, meanwhile, got to argue that the lack of a GPS device in the vehicle meant that it was impossible for traffickers to locate Mr. Gonzalez to surreptitiously unload the drugs. As the prosecutor argued in closing: "You would need a known and discrete location to unload the drugs." 6-ER-1313. The suggestion was that, for the scheme to work, Mr. Gonzalez had to be in on it.

Even so, the jury deadlocked 11–1 in favor of acquittal. 7-ER-1371. The court declared a mistrial, and the government went back to the drawing board. It changed a few things for the second trial.

## A. The government conducted an ex parte viewing of Mr. Gonzalez's van and cut wires connecting a GPS tracker to other parts of the vehicle.

First, the government discovered that Mr. Gonzalez's car, in fact, contained a hidden GPS tracker that appeared to be wired to other devices. During an unannounced viewing of the car without defense counsel, the government's automobile expert cut the tracker out of the vehicle. 4-ER-598, 602.

8

The government's automobile expert testified at the second trial about what he saw and did at the ex parte viewing. *See* 4-ER-598. He said that, with the GPS device removed, he could not determine how it interacted with the rest of the vehicle. 4-ER-606. For example, at trial, the government's automobile expert testified that the GPS tracker appeared to have been connected to a microphone, but it was impossible to determine. 4-ER-605. Similarly, the government's automobile expert also testified that the tracker was connected to a "relay" that would allow someone to cut power to another part of the vehicle, such as the fuel pump. 4-ER-609. That could, in effect, cause the vehicle to stop at the command of someone tracking the vehicle from afar. *Id.* But, once again, it was impossible to determine to what the GPS's relay was connected once the device had been removed. *Id.*

### B. The government called a new expert in drug values that allowed the government to argue that the drugs' value was double what it argued in the first trial.

At the second trial, the government put on a new expert as to the wholesale value of drugs. 2-ER-22. And this new expert testified that the wholesale value of the drugs in Mr. Gonzalez's car could have been *double* what the government argued in the first trial. *Compare* 7-ER-

9

1316 ($125,000) *with* 5-ER-769 ($250,000).

Here is how the government changed the math. In the first trial the government called Agent Drew Flood, a veteran of the Department of Homeland Security, who provided a range of wholesale drug prices from a price list as of November 2021. 6-ER-1161–62. Then, based on his experience and consulting various sources, he opted to use the low-end of the ranges for wholesale methamphetamine and fentanyl. 6-ER-1165. "I always utilize the conservative, the low end," the agent said. 6-ER-1173; *see also* 6-ER-1165. That made the total alleged value of the drugs in Mr. Gonzalez's car to be about $125,000. *See* 7-ER-1316. The prosecutor mentioned that sum twice during closing argument. *See id.*; 7-ER-1349.

In the second trial, the government put on a less experienced expert in drug values, Special Agent Jamisha Johnson. 2-ER-22. Agent Johnson no longer regularly worked drug cases. 4-ER-491. Even so, she accessed the same law enforcement price lists relied upon by Agent Flood. 4-ER-523. Those prices, according to the list, were a "modified average" of reported prices by various officers following undercover transactions in other prosecutions and from interviews with informants

10

and suspects. *See* 2-ER-91; 4-ER-503. They included a high-end price and a low-end price for a single pound or kilogram of various drugs, without accounting for potential bulk discounts. 2-ER-91. But at a pretrial hearing and on the witness stand, Agent Johnson could not explain "the exact internal process" used to produce the price list, 4-ER-509; *see also* 2-ER-73, had not participated in a price survey, 4-ER-527, could not explain how the price list arrived at its "modified average," *id.*, or if it matched information from undercover sources, *id.*

So, on the stand, Agent Johnson simply multiplied the high and low per unit prices by the weight of the drugs in Mr. Gonzalez's car and came up with a low estimate and a high estimate for the drugs' value. 4-ER-514. In other words, unlike Agent Flood, Agent Johnson did not make a call—based on experience—whether to use the high or low estimate from the drug price list.[2]  Instead, the agent just repeated both figures and did basic multiplication.[3]  *See* 4-ER-514, 516–17, 523.

---

[2] Although Agent Flood acknowledged that the price list contained a high end, he declined to use it for calculating the value of the drugs in this case. 6-ER-1165, 1173.

[3] Agent Johnson also subtracted about 10% of the drugs' weight to account for packaging. 4-ER-513, 515.

11

The prosecutor in the second trial chose the bigger number—
$246,000. In fact, he made it the centerpiece of his closing argument,
mentioning it early and often. *See* 5-ER-769, 773, 777. "[T]his isn't
about drugs," the prosecutor said, in a marked contrast from the first
trial. "This is a case about money. This is a case about almost $250,000
worth of drugs." 5-ER-769.

### C. Prosecutors elicited additional testimony that Mr. Gonzalez's car smelled like gasoline from an officer that did not mention the smell in the first trial.

The next change in the second trial is that the government made a
bigger effort to prove that the inside of Mr. Gonzalez's car smelled like
gasoline. The implication would be that if the car smelled, Mr. Gonzalez
must have known that something was amiss. In the first trial, the only
witness to comment on the vehicle's smell was Officer Michael
Alexander, who briefly encountered Mr. Gonzalez outdoors at the port
of entry before referring him to secondary inspection. 5-ER-834.

But in the second trial, the government wanted to persuade the
jury that the smell of gasoline was so strong that Mr. Gonzalez had to
have noticed it from inside the vehicle. Thus, the prosecution began its
opening statement by bringing the disassembled gas tank from

12

Mr. Gonzalez's van into the well, fumigating the courtroom. *See* 3-ER-265; 5-ER-772. The prosecutor told the jury that "the smell of gasoline coming from the defendant's vehicle will speak to the defendant's knowledge." 3-ER-268. In closing argument, the prosecutor noted that multiple officers could smell gas, even while the tank remained within the vehicle. 5-ER-774.

That more muscular argument rested on some updated testimony from Officer Del Rio, who performed the extensive inspection of Mr. Gonzalez's vehicle after it was seized. Thus, at the second trial, much of his testimony was the same, except for one thing. Now, following a leading question from the government,[4] he noted "the smell of gasoline." 3-ER-356.

Yet in the first trial, Officer Del Rio made no mention of the smell of gasoline despite testifying at length about all the things he noticed during his lengthy inspection of the vehicle. 5-ER-876–97. That was notable, from Mr. Gonzalez's perspective, because Officer Del Rio noted

---

[4] The prosecutor asked: "When you were around the defendant's van and conducting your inspection, did you observe anything with any of your senses *other than your sight*?" 3-ER-356 (emphasis added).

13

that he was assigned to do "a more comprehensive inspection" of the vehicle and that he was told about suspected anomalies in the gas tank. 5-ER-882, 885, 887, 889, 891–93, 968. He also testified about things he noticed about the fuel gauge and fuel line. 5-ER-893, 964, 973. He even called in a mechanic to further inspect the tank. 5-ER-889. And although the prosecutor asked Officer Del Rio four times what he thought was "unusual" about various parts of the vehicle, he never mentioned smelling gasoline in his testimony or in his report. 5-ER-891–92, 895, 897.

On cross-examination, Mr. Gonzalez sought to ask Officer Del Rio if he had noted the vehicle's smell during his testimony in the first trial. But the government objected. The district court sustained, because in its view of the law, the prosecutor had not asked Officer Del Rio a sufficiently "similar question" such to permit "impeachment by omission." 3-ER-371.

In supplemental briefing, Mr. Gonzalez explained that the question is not whether the prosecutor asked a sufficiently similar question but whether the circumstances were such in the first trial that it would have been natural for Officer Del Rio to mention the vehicle's

14

purported smell. The district court reaffirmed its ruling. 3-ER-378.

Mr. Gonzalez did, however, ask Officer Del Rio if he mentioned the

smell of gasoline in his report on his inspection. 3-ER-382. He

acknowledged that he did not. *Id.*

> ### D. During closing arguments, the prosecutor accused Mr. Gonzalez of lying, called his defense "ridiculous," claimed that drug traffickers would not trust $250,000 worth of drugs to an unknowing courier, and misstated the testimony of the automobile expert.

The final major change in the second trial is that the government

took the gloves off at closing argument. For one, the prosecutor

expressed his personal opinion about Mr. Gonzalez's theory of the case.

That opinion was not favorable.

He told the jury that Mr. Gonzalez's "story . . . is *ridiculous* on its

face." 5-ER-776 (emphasis added). Mr. Gonzalez objected to improper

argument. *Id.* At another point he asked, "that's the plan? *You've got to*

*be kidding*. This doesn't make any sense because it's all built on a house

of cards. It's not based on the facts. *It's not based on the truth*. It's not

15

based on reality." 5-ER-798 (emphases added). Mr. Gonzalez again objected. *Id.*

At another point, over Mr. Gonzalez's objection, the prosecutor suggested that the jury ignore evidence put on by Mr. Gonzalez and focus on the "evidence that matters." 5-ER-800. The prosecutor also suggested that Mr. Gonzalez had to be lying because "he alone has a powerful motive to tell a story that gets him out of trouble here today." 5-ER-776. Mr. Gonzalez objected to that, too. *Id.* And, to tie a bow on the case, the prosecutor was blunt: Mr. Gonzalez "knew," the prosecutor claimed. 5-ER-799. "That's all. That's all. He is guilty." *Id.*; *see also* 5-ER-800 ("He knew what he was doing. He's guilty of the charges.").

Furthermore, the prosecutor suggested that Mr. Gonzalez's theory of the case had to be false because "it is in no way consistent with commonsense experience or wisdom to think that they then turned around and just randomly gave [$250,000 of drugs] to this guy." 5-ER-773; *see also* 5-ER-797, 799, 771. (making similar claims). Mr. Gonzalez objected that those remarks shifted the burden onto the defense. *Id.*

Finally, over Mr. Gonzalez's objection, the prosecutor misstated the testimony of automobile expert Kenneth Davis. In closing

16

argument, the prosecutor told the jury that, "[y]ou know about the smell. Ken Davis gave you ample evidence when he described the modifications for you to conclude *that fumes were spewing out of the gas tank the whole time*." 5-ER-797. That reenforced the second prosecution's "smell" theme.

But Mr. Davis never testified about the vehicle's smell. In fact, the district court sustained Mr. Gonzalez's objections any time the prosecution tried to ask him about the smell. 4-ER-572–73.

This time, after a full day of deliberation, the jury convicted. The district court sentenced Mr. Gonzalez to three years in prison and three years of supervised release. Mr. Gonzalez timely appeals his conviction only.

### SUMMARY OF THE ARGUMENT

Mr. Gonzalez's conviction must be reversed because of four prejudicial errors.

First, the government violated due process—and Mr. Gonzalez's right to put on a complete defense—by irreparably destroying obviously exculpatory evidence that could not be replicated. That is because the first trial—and prior cases—put the government on notice that a GPS

17

tracker and microphone wired into the vehicle of a regular border-crosser supports a defense that the driver did not know drugs were in the vehicle. Yet, in between trials, the government removed a GPS tracker and microphone wired into the van. That the government altered this evidence while being aware of its exculpatory value amounted to "bad faith." *See United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013). And because Mr. Gonzalez could not replicate its exculpatory value post-destruction, he could not obtain comparable evidence. *See id.*

Second, the government elicited expert testimony about the wholesale value of narcotics that violated the Federal Rules of Evidence and the Confrontation Clause. That is because the purported expert did not actually know how a law enforcement price list determined the average price of various drugs. Instead, the officer simply acted as a "conduit" for the opinions of other officers, without providing any independent analysis. *See United States v. Shih*, 73 F.4th 1077, 1098 (9th Cir. 2023). Indeed, in doing so, the new expert allowed that the value of the drugs in the car could be *double* what the expert testified in the first trial. That does not amount to reliable expert testimony under

18

Rule 702. *Id.* And because the officer provided no independent analysis, her reliance on testimonial hearsay also violated Mr. Gonzalez's right "to be confronted with the witnesses against him." U.S. Const. amend. VI.

Third, the district court erroneously barred Mr. Gonzalez from impeaching by omission an officer who made new material observations about the vehicle's smell in the second trial. A key theme of the second prosecution was that Mr. Gonzalez's vehicle smelled so strongly of gas that he must have known the gas tank had been altered to carry drugs. The problem is that one of the two officers who now claimed to smell gas fumes made no mention of them in the first trial. Because courts and treatises agree that "any material variance between the testimony and the previous statement suffices" to justify impeachment by omission, 1 *McCormick on Evidence* § 34 (Robert P. Mosteller ed., 8th ed. 2022), the district court erred in barring cross-examination on the topic.

Fourth, and finally, the prosecutor committed repeated misconduct during closing argument. It is well-settled that a prosecutor cannot express personal opinions about the evidence, shift the burden of proof, or misstate the evidence. Here, the prosecutor did all three. He

19

expressed personal opinions on the evidence by calling Mr. Gonzalez's case "ridiculous" and "not based on the truth." 5-ER-776, 798. He shifted the burden of proof by insisting that Mr. Gonzalez prove how it is "consistent with commonsense experience or wisdom to think that" drug traffickers took nearly $250,000 worth of drugs and "then turned around and just randomly gave it to" an unknowing courier. 5-ER-773. That is particularly problematic because the government—and this U.S. Attorney's Office in particular—knows that is false. *See United States v. Flores*, 510 F. App'x 594, 595 (9th Cir. 2013).

Finally, the prosecutor argued a purported fact not in evidence that, if true, would buttress a theme of the second prosecution with expert testimony. The prosecutor erroneously claimed that the automobile expert "gave you ample evidence when he described the modifications for you to conclude that fumes were spewing out of the gas tank the whole time." 5-ER-797. The expert did no such thing. In fact, when the prosecution repeatedly tried to ask the expert about the car's smell, the district court sustained Mr. Gonzalez's objections.

Those errors warrant reversal. And that is especially so when considered under this Court's cumulative-error doctrine. Because

20

"[w]here, as here, there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). That is especially so where, as here, the government's evidence is weak. *Id.* After all, the first jury nearly acquitted.

ARGUMENT

## I.  The government violated Mr. Gonzalez's right to due process when it destroyed obviously exculpatory evidence.

### A. Standard of Review

"Whether a defendant's due process rights were violated by the government's failure to preserve potentially exculpatory evidence is reviewed de novo." *United States v. Sivilla*, 714 F.3d 1168, 1172 (9th Cir. 2013). This Court "review[s] factual findings, such as the absence of bad faith, for clear error." *Id.* "Admission of evidence to which there was no objection raised below is reviewed for plain error." *United States v. Wells*, 879 F.3d 900, 925 (9th Cir. 2018).

21

**B. The government cannot destroy or limit access to evidence that is known to be exculpatory and cannot be replicated.**

The Due Process Clause requires that "criminal prosecutions must comport with prevailing notions of fundamental fairness." *California v. Trombetta*, 467 U.S. 479, 485 (1984). To safeguard that right to present a complete defense, the Supreme Court acknowledges "constitutionally guaranteed access to evidence." *Id.* (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867 (1982)). At bottom, the doctrine "delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system." *Id.*

That is why, under *Brady v. Maryland*, 373 U.S. 83 (1963), "the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Trombetta*, 467 U.S. at 485. That is why the Supreme Court has warned the government against impeding a defendant's access to third-party evidence. *Id.* at 486. And that is why the government cannot destroy evidence, making it useless for a defendant. *United States v. Cooper*, 983 F.2d 928, 931 (9th Cir. 1993).

22

This Court employs a two-part test to assess if the destruction of evidence rises to the level of a constitutional violation. First, the government must act in "bad faith." *Sivilla*, 714 F.3d at 1172. And second, "the missing evidence is 'of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.'" *Id.* (quoting *Trombetta*, 467 U.S. at 489). The government's removal and damaging of the GPS device and microphone wired into Mr. Gonzalez's van satisfies both prongs.

## C. The government acted in bad faith.

Whether the government acted in bad faith in destroying evidence "turns on the government's knowledge of the apparent exculpatory value of the evidence at the time it was lost or destroyed." *Id.* (quoting *Cooper*, 983 F.2d at 931); *see also United States v. Zaragoza-Moreira*, 780 F.3d 971, 977 (9th Cir. 2015).

In *Cooper*, the government destroyed the drug-making equipment of a man charged with making methamphetamine. 983 F.2d at 931. The government knew that the man's defense was that the equipment had been used to make naval jelly and dextran sulfate—both lawful substances—and that it was incapable of making methamphetamine.

23

*Id.* at 930–31. Nevertheless, the DEA gave the lab equipment to a contractor known to dispose of seized items unless asked to preserve them. *Id.* at 930. The government made no such ask. *Id.*

The district court dismissed the indictment because of the destruction of evidence, and this Court affirmed. *Id.* at 933. That was because the "[t]he equipment's value as potentially exculpatory evidence was repeatedly suggested to government agents." *Id.* at 931. That made its value "apparent to government agents before they, in bad faith, allowed its destruction." *Id.* at 931.

The government does not get a pass if it claims that a failure to preserve evidence "was a mere 'oversight'" or that it acted in "negligence or recklessness." *Zaragoza-Moreira*, 780 F.3d at 980. Rather, a reviewing court must assess the government's whole conduct in light of defense requests and arguments. *Id.* at 980.

In *Zaragoza-Moreira*, for example, a woman who was arrested for trying to import drugs claimed that she acted under duress at her initial interrogation. *Id.* at 979. The U.S. Customs and Border Patrol agent, meanwhile, was aware of such a defense and knew that she had a "professional obligation to collect and preserve both exculpatory and

24

inculpatory evidence." *Id.* at 980. Nevertheless, the agent allowed a video of the interrogation to be deleted in the normal course. *Id.* This Court held that the failure to act—given the clarity of the duress claim—amounted to bad faith.[5] *Id.* Thus, this Court reversed the conviction and remanded "to the district court with directions to dismiss the indictment." *Id.* at 982.

The same finding of bad faith is required here. The government and its agents have known for years that the presence of a GPS device is exculpatory evidence in a drug trafficking case. *See, e.g.*, Amicus Br., *supra*, at 5–8. That is because drug traffickers often place the devices on the vehicles of unknowing couriers—so called "blind mules"—so that they can surreptitiously retrieve drugs on the other side of the border. *See, e.g.*, Amicus Br., *supra*, at 5–8. That knowledge alone establishes bad faith in tampering with a GPS device found in the vehicle of someone accused of smuggling drugs.

---

[5] The Court also held that it was "particularly disturbing" that the Assistant U.S. Attorney did not ask the U.S. Customs and Border Patrol to preserve the video when first asked by the defense. 780 F.3d at 981. This Court did not resolve whether that, too, amounted to bad faith under *Trombetta* because it was unnecessary for the holding. *Id.*

25

But more specifically, the government repeatedly demonstrated knowledge of the GPS tracker's and microphone's exculpatory value— and its potential connection to other devices in the van—in *this* case. The government first did so when it cut out what it *thought* was a GPS tracker and a microphone from Mr. Gonzalez's car at the port of entry and then notified Mr. Gonzalez. It did so again when it highlighted the apparent lack of a GPS in his vehicle by arguing that there would have been no way for smugglers to locate Mr. Gonzalez's car without making prior arrangements. 6-ER-1313. It did so again immediately after it removed the actual GPS device from the vehicle by notifying Mr. Gonzalez. And it did so yet again when its expert documented how the actual GPS device was connected to various wires and a relay *before* the government cut it out of the vehicle. *See* 4-ER-602. Indeed, the expert acknowledged at the second trial that those wires could have been connected to a relay and microphone, but it was impossible to tell after the government's repeated destruction of evidence.

As in *Cooper* and *Zaragoza-Moreira*, the prosecution knew well that the destroyed evidence had exculpatory value. It matters not if the government claims that any destruction was negligent, reckless, or just

26

part of standard protocol. *Zaragoza-Moreira* teaches that it is the government's knowledge of the exculpatory value of the evidence that carries the day. Thus, the government acted in bad faith in its removal of sensors from Mr. Gonzalez's vehicle.

### D. The GPS device and microphone—and how they were wired into the vehicle—were of such a nature that Mr. Gonzalez was unable to obtain comparable evidence.

As this Court has recognized, "[g]eneral testimony about the possible nature of the destroyed equipment would be an inadequate substitute for testimony informed by its examination." *Cooper*, 983 F.2d at 932. That is because once the government destroys the physical evidence, any testimony is conjectural. *See id.* That prevents a witness from making "a firm determination" that would be most persuasive to the jury. *Id.*

Thus, in *Cooper*, this Court held that it was not comparable evidence for the defendants to call an expert who would testify that their equipment could not manufacture methamphetamine, but only "if their description of the [equipment] w[as] accurate." *Id.* Similarly, a jury instruction directing the jury to assume that the defendant's laboratory was set up to make a lawful substance "would cheat [the

27

defendants] out of the opportunity to establish the weight of their claim to innocence." *Id.*

Much the same could be said here. Without the GPS or microphone connected to Mr. Gonzalez's vehicle, his trial lawyer was left to speculate as to what extent that device could monitor the driver. *See* 5-ER-790–91. And the GPS and microphone were not connected to Mr. Gonzalez's vehicle because of the wire-cutting done at the port of entry and during the ex parte inspection between trials. His trial lawyer thus no longer could prove that the tracker attached to a microphone that monitored Mr. Gonzales. 4-ER-605. She could not prove that the GPS device attached to Mr. Gonzalez's fuel pump via the relay. 4-ER-609–10. All she could do was elicit testimony that was contingent on her hypothetical's accuracy. *See* 4-ER-609–10. That is not comparable evidence under *Cooper*.

The result is that Mr. Gonzalez was denied the power of the most exculpatory evidence in his case: Someone placed a hidden GPS tracking device and microphone in his car that potentially allowed prying eyes and ears to monitor the vehicle and even turn it off remotely. That undermined the government's claim that he knew that

28

he was transporting drugs. Indeed, that is why the prosecutor dismissed it as "speculation" in closing argument. *See* 5-ER-796. But because of the government's destruction of clearly exculpatory evidence, the defense could only make a weak version of that argument based in conjecture. That does not honor a person's right to put on a full defense that the Supreme Court and this Court repeatedly have recognized. Mr. Gonzalez's prosecution was thus incurably tainted.

## II.   A government agent's testimony about drug prices violated the Federal Rules of Evidence and the Confrontation Clause.

The prosecution violated Federal Rules of Evidence 702 and 703, as well as the U.S. Constitution, when it elicited expert testimony that rested on unreliable methods and testimonial hearsay.[6]

### A. Standard of review

This Court "review[s] the district court's decision to admit expert testimony for an abuse of discretion." *United States v. Ruvalcaba-Garcia*, 923 F.3d 1183, 1188 (9th Cir. 2019).

---

[6] If the Court concludes that there was error under the Rules of Evidence or Sixth Amendment but disagrees as to prejudice, it still must consider the error as part of the cumulative error analysis in Part V. *See infra* 56.

29

This Court reviews for plain error whether admitted evidence violated the Confrontation Clause if the defendant failed to object. *United States v. Macias*, 789 F.3d 1011, 1017 (9th Cir. 2015).

## B. The drug price expert had no reliable basis for her opinions and simply parroted the out-of-court statements of others.

"Before admitting expert testimony into evidence, the district court must perform a 'gatekeeping role' of ensuring that the testimony is both 'relevant' and 'reliable' under Rule 702." *Ruvalcaba-Garcia*, 923 F.3d at 1188 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). Agent Johnson's parroted estimates about drug prices were relevant. The problem is that the agent could not explain why, in her purportedly expert opinion, they were a reliable basis to infer the drug value in *this* case.

This Court repeatedly has held that "bare qualifications alone cannot establish the admissibility of . . . expert testimony." *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 860 (9th Cir. 2014) (omission in original) (citation omitted)). Rather, admissible expert testimony also "must 'have a reliable basis in the knowledge and experience of [the expert's] discipline.'" *Id.* (quoting *Kumho Tire Co. v.*

30

*Carmichael*, 526 U.S. 137, 148 (1999)). "This gatekeeping obligation 'applies to all (not just scientific) expert testimony.'" *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020) (citation omitted).

If anything, this Court has cautioned that "reliability becomes more, not less, important when [an] 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *See id.*; *see also United States v. Vera*, 770 F.3d 1232, 1235 (9th Cir. 2014) (holding, in a case about a law enforcement expert, that this Court "again emphasizes that such expert opinions must rest on reliable methodology").

Thus, when it comes to reliability, there is at least one bright-line rule: An expert "must be 'more than a conduit or transmitter for testimonial hearsay.'" *United States v. Shih*, 73 F.4th 1077, 1098 (9th Cir. 2023) (quoting *Vera*, 770 F.3d at 1237); *see also Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony."); *United States v. Kantengwa*, 781 F.3d 545, 561 (1st Cir. 2015); *United States v. Garcia*, 793 F.3d 1194, 1212 (10th Cir. 2015).

31

The Supreme Court recognizes that such holdings flow from Rule 702's text: "[T]rial courts can screen out experts who would act as mere conduits for hearsay by strictly enforcing the requirement that experts display some genuine 'scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue.'" *Williams v. Illinois*, 567 U.S. 50, 80 (2012) (quoting Fed. R. Evid. 702(a)). That limit also provides an exception to Rule 703's provision that allows "experts [to] testify to opinions based on inadmissible evidence, including hearsay." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).

For example, in *United States v. Tipton*, 269 F. App'x 551 (6th Cir. 2008) (unpublished), the Sixth Circuit demonstrated how the rule against conduits interacts with asking an "expert" to calculate a simple math problem based on unexplainable variables. There, the defendants were convicted of tax evasion. *Id.* at 553. The defendants offered an expert to calculate their total tax liability, but those "opinions were based solely" on the defendants' statements regarding the value of their assets. *Id.* at 560. The trial court excluded the testimony, and the Sixth Circuit affirmed. *Id.* That was because the "proposed testimony was

32

unreliable due to [the expert's] failure to verify the facts upon which he based his calculations of the Defendants' tax liability." *Id.* at 560.

Much the same could be said here. Agent Johnson's opinions about the value of drugs was dependent entirely on prices listed on a document put out by a clearinghouse for regional law enforcement agencies. 4-ER-504. And, like the expert in *Tipton*, Agent Johnson could not verify those prices' reliability. She could not explain the "internal process" used to arrive at the low and high "modified averages." 4-ER-527. She could not say that she verified the figures with actual drug traffickers. *Id.* And unlike the veteran agent called in the first trial, Agent Johnson could not even say whether, in her experience, it was more appropriate to use the low or high price given by the survey. Thus, that range allowed her to effectively double the value of the drugs in Mr. Gonzalez's van without any explanation.

All Agent Johnson could say is that other officers relied on the price list, too. But that doesn't solve the conduit problem for Agent Johnson. Because, once again, she could not explain how other officers use the price list. Do they use the low end ($800 per pound) or the nearly three-times greater higher end ($2200 per pound)? 4-ER-525. Do

33

they take an average? Do they rely on it in only certain types of cases? Do they understand how the price list arrives at its "modified averages"? Agent Johnson could speak to none of that.

Further, such erroneous testimony prejudiced Mr. Gonzalez. To see how, one need look no further than the beginning of the prosecutor's closing argument, in which he declared: "[T]his isn't about drugs. This is a case about money. This is a case about almost $250,000 worth of drugs." 5-ER-769; *see also* 5-ER-773 ("$246,000 is at risk here. This is about money."); *see also* 5-ER-777. That provided a marked contrast from the first trial's closing arguments, where the prosecution mentioned the drugs' value twice in passing. 7-ER-1316, 1349.

In other words, in the second trial, the government stated that its key evidence of knowledge was a valuation of the drugs that the jury never should have heard. It necessarily follows that if one removes that evidence, the government cannot prove that any error was harmless.

### C. The drug price expert relied on the out-of-court testimony of people whom Mr. Gonzalez could not cross-examine.

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be

34

confronted with the witnesses against him.'" *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (alterations in original) (quoting U.S. Const. amend. VI). Under *Crawford* and its progeny, "a defendant's Confrontation Clause rights are violated by the admission of 'testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had . . . a prior opportunity for cross-examination.'" *Vera*, 770 F.3d at 1237 (omission in original) (quoting *Crawford*, 541 U.S. at 53–54). Statements are testimonial if "in response to police interrogation," *Davis v. Washington*, 547 U.S. 813, 822 (2006), or "questioning, 'the primary purpose of [which was] to establish or prove past events potentially relevant to later criminal prosecution.'" *Lucero v. Holland*, 902 F.3d 979, 989 (9th Cir. 2018) (alteration in original) (quoting *Davis*, 547 U.S. at 822).

As numerous courts—including this one—have recognized, *Crawford*'s rule runs headlong into the accepted practice of experts relying upon out-of-court testimonial statements in presenting their opinions to the jury. *E.g.*, *Vera*, 770 F.3d at 1237; *Mejia*, 545 F.3d at 198. Indeed, the Supreme Court appears sensitive to this problem with expert witnesses in the recently argued case of *Smith v. Arizona*, 22-

35

899. *See* Amy Howe, *Court Appears to Favor Arizona Man's Confrontation Clause Claim*, SCOTUSblog (Jan. 10, 2024, 5:48 PM), https://www.scotusblog.com/2024/01/court-appears-to-favor-arizona-mans-confrontation-clause-claim/. "[O]nce you just give someone else's testimony and it is the only basis for your opinion, then it's really you being a conduit." Tr. of Oral Argument at 17, *Smith v. Arizona*, No. 22-899 (Jan. 10, 2024) (Sotomayor, J.).

Thus, this Court and others have settled on a balance that is nearly identical to that struck with admitting any expert evidence: An expert "violates a defendant's Confrontation Clause rights when he 'is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose considered opinion sheds light on some specialized factual situation.'" *Vera*, 770 F.3d at 1237 (citation omitted); *see also United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003); *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009). That is because "[a]llowing a witness simply to parrot 'out-of-court testimonial statements of *cooperating witnesses* and *confidential informants* directly to the jury in the guise of expert opinion' would provide an end run around *Crawford*." *United States v. Gomez*, 725 F.3d

36

1121, 1129 (9th Cir. 2013) (emphases added) (quoting *Johnson*, 587 F.3d at 635 and collecting cases).

That makes Agent Johnson's testimony doubly inadmissible, this time under the Confrontation Clause. The admission of her price quotes for bulk methamphetamine and fentanyl amounted to error, that was plain, under this Court's decisions in *Vera* and *Gomez*, as well as the wealth of authority from other circuits.

First, the out-of-court prices quoted by Agent Johnson were testimonial. As the government acknowledged, a "core purpose" of the price list was "to provide intelligence on different types of cases . . . for example, drug prices."[7] 2-ER-43–44. In other words, the list is meant "to establish or prove past events potentially relevant to later criminal prosecution." *Lucero*, 902 F.3d at 989. And regardless of the testimonial nature of the database itself, its drug prices are necessarily derived

---

[7] The price list, made by the San Diego Law Enforcement Coordination Center ("LECC"), also notes that, among other things, it seeks to "provide assistance from initiation through adjudication of a case." San Diego Law Enforcement Coordination Center, *About the SD-LECC*, https://sdlecc.org/default.aspx?MenuItemID=144&MenuGroup=2021+S DLECC (last visited Feb. 12, 2024).

37

from out-of-court officers questioning out-of-court people accused of buying and selling illegal drugs. 4-ER-503–04. In other words, the prices are collected through informants and suspects, 4-ER-504, also known as "cooperating witnesses and confidential informants," *Gomez*, 725 F.3d at 1129. As Agent Johnson testified at trial, the point of a controlled purchase of drugs is "to gather *evidence* in our investigation." 4-ER-502 (emphasis added). That is testimonial hearsay defined. *Lucero*, 902 F.3d at 989, and makes its admission error that is plain.

That Confrontation Clause error meanwhile demonstrated a "reasonable probability" of a different verdict.[8] *See United States v.*

_____

[8] When defense counsel fails to object, any error must affect the client's "substantial rights." Fed. R. Crim. P. 52(b). For an error to affect substantial rights, there must be "'a reasonable probability that, but for the error,' the outcome of the proceeding would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). That is less than a preponderance of the evidence, *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004), and markedly so, *see Strickler v. Greene*, 527 U.S. 263, 300 (1999) (Souter, J., concurring in part and dissenting in part); *see also United States v. Michell*, 65 F.4th 411, 426 (9th Cir. 2023) (Baker, J., concurring in part and dissenting in part). "More than a mere possibility" of a different outcome suffices, *United States v. Tydingco*, 909 F.3d 297, 306 (9th Cir. 2018), and it is a "relatively low burden," *Chinn v. Shoop*, 143 S. Ct. 28 (2022) (Jackson, J., dissenting from denial of certiorari).

38

*Sanders*, 421 F.3d 1044, 1051 (9th Cir. 2005). And that is so for two reasons. First, the testimonial hearsay was the only basis for the claimed drug value, and the prosecution repeatedly focused on drug value as evidence of Mr. Gonzalez's knowledge—the only element of the offense disputed at trial. Thus, this is not a case like *Macias*, where the Confrontation Clause violation did not affect the defendant's substantial rights because there was "overwhelming evidence" of the fact proven by the testimonial hearsay. *See* 789 F.3d at 1019. Similarly, unlike in *Macias*, Mr. Gonzalez had no opportunity to belatedly cross-examine those involved in producing the testimonial hearsay. Indeed, Agent Johnson could not explain who was responsible for the drug prices listed in her report. *See id.* at 1019–20. That is "sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Finally, the use of out-of-court testimony to prove a key element of the offense "particularly undermines the fairness, integrity, or public reputation of judicial proceedings." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1908 (2018). That is the "principal evil" that the Sixth Amendment was designed to prohibit. *Crawford v. Washington*, 541

39

U.S. 36, 50 (2004). Thus, even on plain-error review, Agent Johnson's reliance on testimonial hearsay violated the confrontation clause and warrants reversal.

## III. The district court erroneously barred Mr. Gonzalez from impeaching by omission.

### A. Standard of Review

This Court reviews "[a] challenge to a trial court's restrictions on the manner or scope of cross-examination on nonconstitutional grounds . . . for abuse of discretion." *United States v. Larson*, 495 F.3d 1094, 1101 (9th Cir. 2007) (en banc). But reviewing for an abuse of discretion requires this Court "first to consider whether the district court identified the correct legal standard for decision of the issue before it." *United States v. Hinkson*, 585 F.3d 1247, 1251 (9th Cir. 2009) (en banc). And this Court "review[s] the district court's identification of the correct legal standard de novo." *United States v. Gasca-Ruiz*, 852 F.3d 1167, 1170 (9th Cir. 2017) (en banc). A failure to "identif[y] the correct legal standard for decision of the issue" necessarily is an abuse of discretion. *Hinkson*, 585 F.3d at 1251.

40

### B. Criminal defendants have wide latitude to impeach by omission.

"Common law traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which that fact naturally would have been asserted." *Jenkins v. Anderson*, 447 U.S. 231, 239 (1980) (citing 3A J. Wigmore, Evidence § 1042, p. 1056 (Chadbourn rev. 1970)). So-called "impeachment by omission" is permissible whenever a witness's trial testimony includes extra facts that naturally would have been included in earlier statements. *See United States v. Stock*, 948 F.2d 1299, 1301 (D.C. Cir. 1991). And "any material variance between the testimony and the previous statement suffices." 1 *McCormick on Evidence* § 34 (Robert P. Mosteller ed., 8th ed. 2022).

This is especially so when a criminal defendant seeks to impeach one of the prosecution's witnesses. As numerous courts have held, "[l]attitude is normally permitted in cross-examining prosecution witnesses, and limitation of such cross-examination may only be based on sound reasons justifying a departure from this norm." *United States v. Ayotte*, 741 F.2d 865, 871 (6th Cir. 1984) (collecting cases). Although

41

this Court does not appear to have defined the full scope of a defendant's right to impeach by omission, it has held that prosecutors "may probe all post-arrest statements and the surrounding circumstances under which they were made, including defendant's *failure to provide critical details.*" *United States v. Ochoa-Sanchez*, 676 F.2d 1283, 1286 (9th Cir. 1982) (emphasis added). It thus follows that at least much leeway, if not more, is warranted for defendants to probe the prior testimony of government witnesses.

### C. The district court erroneously insisted that Mr. Gonzalez show that the witness was asked an identical question in the first trial.

Yet here, the district court erroneously barred Mr. Gonzalez from impeaching Officer Del Rio's new memory that the car smelled strongly of gasoline. It incorrectly reasoned that the questions to Officer Del Rio in the first and second trial were "not similar enough" to permit impeachment. 3-ER-371. That misunderstands the legal standard for impeachment by omission. The question is not whether the questions are similar, but whether there is "any material variance between the testimony and the previous statement." 1 *McCormick on Evidence* § 34. "[S]tatements need not be diametrically opposed to be inconsistent."

42

*United States v. Stewart*, 907 F.3d 677, 687 (2d Cir. 2018) (alteration in original) (citation omitted); *see also United States v. Gajo*, 290 F.3d 922, 931 (7th Cir. 2002); *United States v. Denetclaw*, 96 F.3d 454, 458 (10th Cir. 1996); *Udemba v. Nicoli*, 237 F.3d 8, 18 (1st Cir. 2001).

There was a material variance here. In the first trial Officer Del Rio spent several pages of transcript talking about his investigation of all the unusual parts of Mr. Gonzalez's car and its gas tank. 5-ER-876–897. He never mentioned the smell, despite the "circumstances in which that fact naturally would have been asserted." *Jenkins*, 447 U.S. at 239. Nor did Officer Del Rio mention gasoline in his report or during his direct testimony in the second trial. It was not until redirect, after the government asked him if he "observe[d] anything with any of your senses *other than your sight*," that Officer Del Rio responded: "Just the smell of gasoline." 3-ER-356 (emphasis added).

That is no small detail. Another new theme of the government's second prosecution of Mr. Gonzalez was that the car smelled so strongly of gasoline that he must have known it had been altered to transport drugs. Just consider this passage from closing argument:

There were red flags. The minivan *stunk*. It *smelled* like

43

gasoline. Officers Del Rio and Officer Alexander told you
they're at the port all the time and the *stink* of this gas tank
stood out to them in their memories.

5-ER-774 (emphases added). The prosecutor then asked the jury to
consider the power of the officers' testimony given that "everyone knows
. . . memory associated with a smell is particularly powerful."[9] *Id*.
Indeed, the prosecutor mentioned the "smell," "fumes," or some version
of the word "stink" *nineteen times* during his closing argument. 5-ER-
772, 774–76, 797. By contrast, the government mentioned "smell" just
three times—and made no mention of "fumes" or "stink"—in the closing
argument in its first trial.

But to make that new argument, the government needed Officer
Del Rio, who went inside the vehicle, to also testify that the car smelled.
In the first trial, they merely had the testimony of a single officer who
described a "gassy smell" from his perch in the inspection booth. 5-ER-
839. That had minimal bearing on whether Mr. Gonzalez would have

---

[9] That line drew a sustained objection from Mr. Gonzalez's lawyer. The
prosecutor then made the same point with some different phrasing,
asking the jury to "make the determination" about "a memory
associated with a smell" based on their "own lived experiences." 5-ER-
774. Mr. Gonzalez objected again but was overruled. 5-ER-778.

44

smelled gas from inside the vehicle while driving. And given the
"[l]attitude . . . normally permitted in cross-examining prosecution
witnesses" the district court had no "sound reason," *Ayotte*, 741 F.2d at
871, to bar Mr. Gonzalez from challenging a new theme of the
government's case.[10]  It was thus reversable error to bar Mr. Gonzalez
from pointing out that this was the first time that Officer Del Rio
noticed the fumes.

## IV. The prosecutor committed misconduct during closing argument.

### A. Standard of review

For improper-argument claims, this Court has frequently
reviewed de novo "whether a challenged prosecutorial comment
infringes on a defendant's Fifth Amendment rights." *United States v.
Velazquez*, 1 F.4th 1132, 1136 (9th Cir. 2021) (collecting cases). But this
Court has likewise acknowledged a "potential intracircuit conflict on the
standard of review for challenges to prosecutorial comments," given
that it has sometimes reviewed for abuse of discretion. *Id.* at 1137.

---

[10]  To the extent that the erroneous limiting of cross-examination does
not warrant reversal on its own, the violation must factor into the
cumulative error analysis in Part V. *See infra* 56.

To whatever extent that conflict is real, de novo review applies. "When considering whether a district court erred in applying law to facts, we look to the substance of the issue on review to determine if the question is factual or legal." *Hinkson*, 585 F.3d at 1259. If the inquiry is "essentially factual," the Court reviews for abuse of discretion. *Id.* (quotations omitted). But if the inquiry requires the Court to "exercise judgment about the values that animate legal principles," the inquiry "should be classified as one of law and reviewed de novo." *Id.* at 1260 (quotations omitted). Such inquiries often include "questions that implicate constitutional rights." *Id.*

Here, the prosecutor's comments during closing arguments jeopardized Mr. Gonzalez's right to a fair trial under the Fifth Amendment and thus present a question that "implicate[s] constitutional rights." *Id.* The inquiry is not "essentially factual" because the prosecutor's statements during closing argument are not in dispute. *Id.* at 1259. Rather, the inquiry requires the Court to "exercise judgment about the values that animate legal principles" and should be "classified as one of law and reviewed de novo." *Id.* at 1260. And regardless of which standard the Court employs, the prosecutor's

46

comments were improper.

### B. The prosecutor impermissibly expressed personal opinions about Mr. Gonzalez's veracity and guilt.

"Prosecutors are subject to constraints and responsibilities that don't apply to other lawyers." *United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993). That is because the prosecutor, unlike defense counsel, "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). The "job isn't just to win, but to win fairly, staying well within the rules." *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1191 (9th Cir. 2015) (quoting *United States v. Maloney*, 755 F.3d 1044, 1046 (9th Cir.2014) (en banc)). This Court has made a few such rules clear.

First, "[a] prosecutor has no business telling the jury his individual impressions of the evidence." *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir. 1992). That means the prosecutor "may not express his personal opinion of the defendant's guilt or his belief in the

47

credibility of witnesses." *United States v. McKoy*, 771 F.2d 1207, 1211 (9th Cir. 1985). This rule "is firmly established." *Id.* at 1210–11; *see also Alcantara-Castillo*, 788 F.3d at 1191; *see also Hodge v. Hurley*, 426 F.3d 368, 378 (6th Cir. 2005) ("It is patently improper for a prosecutor either to comment on the credibility of a witness or to express a personal belief that a particular witness is lying.").

Because the prosecutor "is the sovereign's representative, the jury may be misled into thinking his conclusions have been validated by the government's investigatory apparatus." *Kerr*, 981 F.2d at 1053. Put another way, the "prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Alcantara-Castillo*, 788 F.3d at 1191 (alterations in original) (quoting *United States v. Reyes*, 577 F.3d 1069, 1077 (9th Cir. 2009)). The idea is that if the prosecutor says that the evidence is overwhelming, he must be relying on his purview into other cases, some of which may not have featured overwhelming evidence.

Here, the prosecutor expressed personal opinions about Mr. Gonzalez's guilt and truthfulness in unusually caustic terms. After

48

summarizing Mr. Gonzalez's theory of the defense, the prosecutor

mused and said "*You've got to be kidding*. This doesn't make any sense

because it's all built on a house of cards. It's not based on the facts. *It's*

*not based on the truth*. It's *not based on reality*." 5-ER-798 (emphases

added). Similarly, the prosecutor all-but called Mr. Gonzalez a liar

when he noted that Mr. Gonzales "alone has a powerful motive to tell a

story that gets him out of trouble here today. So you heard his story

that is *ridiculous* on its face." 5-ER-776 (emphasis added). The

prosecutor meanwhile suggested that Mr. Gonzalez's evidence, in the

prosecutor's personal opinion, did not qualify as "evidence that

matters." 5-ER-800. Finally, the prosecutor clearly crossed the line

when he declared—without equivocation or citation to evidence—that

Mr. Gonzales "knew. That's all. That's all. He is guilty." 5-ER-799; *see*

*also* 5-ER-800 ("He knew what he was doing. He's guilty of the

charges."). That contravened the "general rule . . . [that] a prosecutor

may not express his opinion of the defendant's guilt." *United States v.*

*Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999).

Those arguments were improper because words like "truth,"

"reality," "ridiculous," and stating unequivocally that Mr. Gonzalez "is

guilty" amounted to the prosecutor giving his "individual impressions of the evidence." *Kerr*, 981 F.2d at 1053. They also suggested that the prosecutor, as a representative of the government and expert in prosecution, was comparing Mr. Gonzalez's defense to others that he has heard.

Indeed, those comments echoed those this Court held to be improper in *United States v. Ruiz*, 710 F.3d 1077 (9th Cir. 2013). There, the prosecutor crossed the line when he urged the jury to convict "on the basis of what the United States considers is *overwhelming* evidence that the defendant is guilty." 710 F.3d at 1085 (emphasis added). That is because the prosecutor "exceeded mere inference; indeed, the prosecutor suggested to the jury that he offered an expert assessment of the strength of the government's case, in light of his training and expertise in criminal prosecutions." *Id.* at 1085–86; *see also United States v. Grunberger*, 431 F.2d 1062, 1068 (2d Cir. 1970) (holding that the prosecutor engaged in misconduct when stating that "I don't know of a case where the evidence has been as strong as it has been in this case to establish the guilt of any defendant"). The same could be said here.

To be sure, "[i]n a case that essentially reduces to which of two

50

conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying." *Ruiz*, 710 F.3d at 1083 (quoting *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991)). For example, if Mr. Gonzalez testified that the sky was blue and another witness testified that it was orange, the prosecutor may have additional latitude to challenge Mr. Gonzalez's veracity. *See id.* But this is no such case. Rather, Mr. Gonzalez testified that he did not know that drugs were in the car and the government, relying on circumstantial evidence, argued that he must have known. In other words, this case was not one of "he said, she said." The government thus had no license to call Mr. Gonzalez a liar.

### C. The prosecutor shifted the burden of proof onto Mr. Gonzalez by demanding that he prove smugglers would trust valuable drugs with an unknowing courier.

A prosecutor also may not shift the burden of proof onto the accused. *Ruiz*, 710 F.3d at 1084. A bedrock principle of the Constitution is that the government must prove each element of the offense beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 362 (1970). So long as the defendant does not raise an affirmative defense, he bears zero burden to prove his innocence at trial and it is error for the prosecutor

51

to suggest otherwise.

Thus, when a prosecutor tries to "highlight the weaknesses of a defendant's case," he must tread lightly. *See United States v. Vaandering*, 50 F.3d 696, 701 (9th Cir. 1995). The prosecutor may "not argue that failure to explain [the weaknesses] adequately requires a guilty verdict." *Id.* at 701–02. The prosecutor must also "reiterate[] that the burden of proof is on the government." *Id.* at 702.

The prosecutor did not tread lightly here. Over Mr. Gonzalez's repeated objections, he argued that the jurors *must* find Mr. Gonzalez guilty because of his purported "failure to explain" claimed weaknesses in his defense. *Vaandering*, 50 F.3d at 702. This happened repeatedly when the prosecutor argued that, because smugglers "stood to make money . . . it is in no way consistent with commonsense experience or wisdom to think that they then turned around and just randomly gave it to this guy." 5-ER-773; *see also* 5-ER-797 (arguing "there is no logical way, no possible way that minivan in that condition could be given by anyone other than the person who knew"); 5-ER-799 ("This gas tank can't be put in the control of a person who doesn't know what they're doing."); 5-ER-771 ("There's no doubt that he [knew drugs were in the

52

car].”). In other words, the government shifted the burden to

Mr. Gonzalez to prove that it was conceivable that drug traffickers

would place the minivan full of drugs in his care if he did not know.

That is not Mr. Gonzalez's burden to shoulder. And because the

prosecutor here never "reiterate[d] that the burden of proof is on the

government," *Vaandering*, 50 F.3d at 702, it amounts to reversable

error.

Those comments were doubly problematic because they also rested

on a premise that the prosecutor knew to be false—that a drug

trafficking organization would not trust $250,000 worth of drugs to an

unknowing courier. The government—and this U.S. Attorney's office in

particular—knows that drug traffickers often load large quantities of

drugs into vehicles of unsuspecting drivers. *See, e.g.*, Amicus Br., *supra*,

at 5 (documenting drug traffickers' placement of drugs and a GPS

tracker in the vehicles of unknowing couriers); *see also Flores*, 510 F.

App'x at 595 (holding that this Court "trust[s]" that the U.S. Attorney's

Office for the Southern District of California will "no longer put[] on

testimony to the effect that blind mules do not exist" after counsel for

the government acknowledged at oral argument that such evidence

exists). The government also is aware of cases in which drugs are hidden from unknowing couriers in aftermarket compartments. Amicus Br., *supra*, at 5–8.

Those improper arguments are all the more troubling given that the government's tampering with the gas tank and GPS tracker prevented Mr. Gonzalez from determining if the GPS device was connected to the fuel pump. *See* 4-ER-609–10. Indeed, as discussed above, the government instead chided Mr. Gonzalez for having to merely speculate about what further investigation into an unremoved gas tank and GPS device might have revealed. 5-ER-796. Thus, the government's suggestion that the car could not have been given to an unknowing courier not amounted to a blow that was not merely "hard" but "foul." *United States v. Prantil*, 764 F.2d 548, 555 (9th Cir. 1985).

## D. The prosecutor misrepresented the testimony of the automobile expert.

The prosecutor committed one more form of prejudicial misconduct in his closing argument. "A prosecuting attorney may not misstate or manipulate the evidence at trial." *United States v. Preston*, 873 F.3d 829, 844 (9th Cir. 2017). That has long been settled. *See*

54

*Berger*, 295 U.S. at 84.

Here, the prosecutor misrepresented expert testimony to further one of the key themes of the second prosecution: that Mr. Gonzalez must have smelled gas fumes in his vehicle. In closing argument, the prosecutor put words in the automobile expert's mouth when he claimed that "[y]ou know about the smell. [The automobile expert] gave you ample evidence when he described the modifications for you to conclude *that fumes were spewing out of the gas tank the whole time*." 5-ER-797 (emphasis added).

But, as noted by Mr. Gonzalez's objection, the automobile expert said no such thing. To the contrary, during his testimony, the district court repeatedly sustained Mr. Gonzalez's objections to the government's repeated questions about the smell of the vehicle. 4-ER-572–73. Thus, unable to get that testimony into evidence the proper way, the prosecutor improperly took it upon himself to testify before the jury. But a prosecutor's closing may not serve as "the missing testimony" to tie his case together. *United States v. Sanchez-Soto*, 617 F. App'x 695, 698 (9th Cir. 2015) (unpublished). That is because, a person "accused of a crime is entitled to have his guilt or innocence

55

determined solely on the basis of the evidence introduced at trial, and not on grounds . . . not adduced as proof at trial." *United States v. Schuler*, 813 F.2d 978, 981 (9th Cir. 1987) (omission in original) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). The misconduct here was particularly egregious given that the prosecutor was misstating the testimony of an undisputed expert—putting extra force behind one of the prosecution's core themes of its second prosecution.

Thus, despite Mr. Gonzalez's repeated objections, the prosecutor committed three forms of misconduct during his closing argument. He gave personal opinions on the evidence, shifted the burden of proof onto the accused, and asserted a fact not in evidence. Those amounted to repeated foul blows on crucial themes of the case, thus prejudicing Mr. Gonzalez.

## V.  Reversal is warranted under a cumulative error analysis.

Although the trial errors above warrant reversal standing alone, reversal is required for another reason. Even when "no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996) (citing

56

*United States v. Green*, 648 F.2d 587 (9th Cir.1981)). Because "[w]here, as here, there are a number of errors at trial, 'a balkanized, issue-by-issue harmless error review' is far less effective than analyzing the overall effect of all the errors in the context of the evidence introduced at trial against the defendant." *Id.* (quoting *United States v. Wallace*, 848 F.2d 1464, 1476 (9th Cir.1988)). That is especially so where, as here, the government's case is weak. *Id.* (citing *United States v. Berry*, 627 F.2d 193 (9th Cir.1980)).

This is such a case. Even if the Court concludes that no single error prejudiced Mr. Gonzalez, those errors cumulatively did. At the outset, the case against Mr. Gonzalez was weak. Once again, another jury nearly found Mr. Gonzalez not guilty based largely on the same evidence.

And in the few areas where the government did change up its case between the first and second trials, in unlawfully pushed the envelope in ways that were key to its new themes. It brought in a new expert that allowed it to double the value of the drugs—making it easier for the government to argue that "this isn't about drugs. This is a case about money. This is a case about almost $250,000 worth of drugs." 5-

57

ER-769. It got another officer to testify that Mr. Gonzalez's car smelled of gas—and then blocked Mr. Gonzalez from highlighting that the officer testified differently in the first trial. It then repeatedly pushed the envelope in closing argument—offering personal opinions (backed by the government's imprimatur) on the defense and fabricating still more evidence on the van's purported smell.

The government simply crossed too many lines at critical junctures to obtain a conviction it could not win when it played by the rules. That is sufficient to undermine faith in the outcome and warrants reversal under this Court's cumulative error doctrine.

## CONCLUSION

Mr. Gonzalez asks this Court to reverse his conviction and order the district court, on remand, to dismiss his case with prejudice.

Respectfully submitted,

Dated: March 1, 2024

*/s/ Daniel J. Yadron, Jr.*
Daniel J. Yadron, Jr.
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5097
Telephone: (619) 234-8467
danny_yadron@fd.org
Attorney for Mr. Gonzalez

58

## CERTIFICATE OF RELATED CASES

Counsel is unaware of any pending related cases before this Court.

Respectfully submitted,

Dated: March 1, 2024

*/s/ Daniel J. Yadron, Jr.*

Daniel J. Yadron, Jr.
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5097
Telephone: (619) 234-8467
danny_yadron@fd.org
Attorney for Mr. Gonzalez

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed.
R. App. P. 32(a)(7)(B) because:

☒     this brief contains 13,239 words, excluding the parts of the
brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

☐     this brief uses monospaced typeface and contains  [_____]
lines of text, excluding the parts of the brief exempted by
Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R.
App. P. 32(a)(5) and the type style requirements of Fed. R.
App. P. 32(a)(6) because:

☒     this brief has been prepared in a proportionally spaced
typeface using Microsoft Word and Century Schoolbook in
size fourteen.

☐     this brief has been prepared in monospaced typeface using
*(state name and version of word processing program)* with
*(state number of characters per inch and name of type style)*
[_____]

*/s/ Daniel J. Yadron, Jr.*

Daniel J. Yadron, Jr.
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5097
Telephone: (619) 234-8467
danny_yadron@fd.org
Attorney for Mr. Gonzalez

Dated: March 1, 2024

61.